**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRAIG FRAZIER, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 11-1863 |
| | : | |
| EXIDE TECHNOLOGIES, | : | |
| Defendant. | : | |
| | : | |

**Goldberg, J.**                                                              **February 10, 2012**

## Memorandum Opinion

Plaintiff, Craig Frazier, an African-American male, alleges that while he was employed by

Defendant, Exide Technologies ("Exide"), his supervisors subjected him to discriminatory treatment

and then retaliated against him when he complained about that treatment. After filing a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC") and receiving a

right to sue letter, Plaintiff filed a complaint in this Court, seeking relief under Title VII of the Civil

Rights Act, the Pennsylvania Human Relations Act, and state tort law.

Presently before the Court is Defendant's "Motion to Dismiss (In Part)." For reasons set

forth below, this motion will be granted in part and denied in part.

## I.      Factual Background

Viewed in the light most favorable to Plaintiff, the complaint essentially alleges that

Plaintiff's supervisors harassed him with racial insults and subjected him to discriminatory treatment.

Plaintiff claims that, among other incidents, a supervisor told him to "pick up the pace nigger," and

made comments to other workers such as "I'm not gonna let that nigger have this job" and "I ain't

letting that nigger pass his evaluation." Plaintiff also claims he was assigned to heavier and more

difficult lifting in an attempt to keep him from meeting his quotas, which he met anyway.  Moreover,

Plaintiff alleges that his supervisors failed to provide the computer training that his white

counterparts received, and thus he was forced to learn from his co-workers.  (Compl. ¶¶ 16, 20(a)-

(d), 21(a).)

The complaint further explains that because of this discriminatory treatment, Plaintiff made

several complaints to Exide's Human Resources Department ("Human Resources").  Instead of

making the situation better, however, Plaintiff alleges that "the behavior continued and became

worse."  On October 18, 2007, after a supervisor allegedly called him a "nigger," Plaintiff left his

employment.  Upon calling Human Resources, Plaintiff was told that he had been terminated.

(Compl. ¶¶ 22-25.)

## II.     Motion to Dismiss Standard

When considering a motion to dismiss, the court must assume the veracity of well-pleaded

factual allegations, construe them in the light most favorable to the plaintiff, and "then determine

whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950

(2009) (reaffirming Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)); Phillips v. Cnty. of

Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  The court may only look to the facts alleged in the

complaint and its attachments when deciding a motion to dismiss.  Jordan v. Fox, Rothschild,

O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

## III.    Discussion

### A.      Failure to Exhaust Administrative Remedies for Certain Title VII Claims

Defendant first argues that Plaintiff's national origin discrimination and retaliation claims

should be dismissed for failure to exhaust administrative remedies.  (Def.'s Br. 6-8.)  Before a

plaintiff may file a Title VII claim in federal court, he must file a complaint with the EEOC, and then wait as the EEOC attempts to mediate the dispute without litigation.  Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).  Here, the Defendant concedes that Plaintiff properly complained to the EEOC about his claim of racial discrimination.  The only question is whether that complaint also encompassed the claims of national origin discrimination and retaliation.

The relevant inquiry in determining whether claims have been administratively exhausted is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."  Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting Waiters, 729 F.2d at 237).  Put another way, "a district court may assume jurisdiction over additional charges if they are reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims."  Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984); Webb v. City of Phila., 2007 WL 210405, at *2 (E.D. Pa. Jan. 23, 2007).

As to the national origin discrimination claim, Defendant explains that Plaintiff did not check the box for "National Origin" discrimination in his EEOC complaint, but merely typed in the word "BLACK."  Defendant also points out that, in its "Notice of Charge of Discrimination," the EEOC only checked the box for "Race," even though a box for national origin was also available.  Thus, Defendant asserts that Plaintiff failed to exhaust his administrative remedies with respect to his national origin claim. (Def.'s Br. 7, Exs. A, B.)  Plaintiff counters that his use of the word "black" both denotes race, and African-American national origin.  Accordingly, Plaintiff urges that he has satisfied the exhaustion requirement. (Pl.'s Br. 9.)

I find that Plaintiff has exhausted his administrative remedies because the law does not

require the rigid analysis Defendant advocates. The EEOC was aware that Plaintiff was African-American, and knew about the racially discriminatory acts alleged in Plaintiff's complaint, including his supervisors' use of the "N'" word. (See Def.'s Br. Ex. A.) Although Plaintiff's national origin allegations are thin, and require several inferences, I must view these allegations in a light favorable to the Plaintiff. I thus conclude that the EEOC investigation into Plaintiff's claim of race discrimination would have also encompassed his national origin discrimination claim.

Defendant further argues that Plaintiff's retaliation claim has the same deficiencies as this box was also not checked on the EEOC complaint, or the EEOC's notice to Defendant. (Def.'s Br. 7, Exs. A, B.) However, Plaintiff indicated in his EEOC complaint that he "made numerous complaints" to Human Resources and to his union representative, all to no avail. (See Def.'s Br. Ex. A.) It is reasonable to conclude that the EEOC would have investigated whether Plaintiff's complaints were followed by retaliation from his supervisors. I therefore find that Plaintiff exhausted his administrative remedies as to both the national origin discrimination claim and the retaliation claim.

**B.        Failure to State a Claim for National Origin Discrimination or Retaliation**

Next, Defendant argues that Plaintiff has failed to properly state a claim with respect to his national origin and retaliation claims. As to the national origin claim, Defendant argues that it must be dismissed because Plaintiff failed to allege his national origin, or to allege that anyone at Exide knew his national origin. As to the retaliation claim, Defendant contends that Plaintiff has not alleged facts tending to show a causal connection between Plaintiff's alleged constructive discharge and his complaints to Human Resources. (Def.'s Br. 8, 9.)

The EEOC's guidelines on discrimination define national origin discrimination broadly, "as

4

including, but not limited to, the denial of equal employment opportunity because of an individual's, or his ancestor's, place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. Thus, one's "national origin" need not refer to a particular country, but "is better understood by reference to certain traits or characteristics that can be linked to one's place of origin, as opposed to a specific country or nation." Kanaji v. Children's Hosp. of Phila., 276 F. Supp. 2d 399, 401-02 (E.D. Pa. 2003).

Most cases permitting national origin discrimination claims to go forward—usually at the summary judgment stage—have contained evidence of discrimination directed more explicitly at the employee's "foreignness." See EEOC v. WC&M Enters., Inc, 496 F.3d 393, 400 (5th Cir. 2007) (reversing grant of summary judgment on national origin discrimination claim where employer said, among other things: "This is America. That's the way things work over here. This is not the Islamic country where you came from."); Sarin v. Poojan, Inc., 2010 WL 2635797, at *12 (W.D. Pa. Apr. 30, 2010) (finding "ample evidence in the record" that plaintiff had been subject to national origin discrimination where he was called "dot head," "dirty Indian," and "sand nigger," and was told to "go back to where he belongs").

In Perez v. N.J. Transit Corp., 341 Fed. Appx. 757, 761 (3d Cir. 2009), which involved comments similar to the instant matter, the discriminatory language at issue was more general than the language used in the cases noted above. Nonetheless, the United States Court of Appeals for the Third Circuit held that evidence that a police chief stated he "would not allow 'Spics and Niggers' to run his department" was sufficient to overcome summary judgment on a national origin discrimination claim. The Court's holding indicates that it viewed 'Spic' as a national origin designation. Perez, 341 Fed. Appx. at 761. I thus conclude that the factual allegations in Plaintiff's

5

complaint, which allege numerous instances in which Plaintiff's supervisors used similar slurs toward him, (Compl. ¶¶ 20(a)-(c)), are sufficient to survive Defendant's motion to dismiss.[1]

As to retaliation, Defendant correctly states that to survive a motion to dismiss, Plaintiff must show: (1) he engaged in a protected activity; (2) the employer took an adverse action against him; and (3) there is a causal connection between participation in the protected activity and the adverse employment action.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).  Defendant concedes, for the purpose of this motion, the first two elements.  (Def.'s Br. 9.)

A temporal connection between the protected activity and the alleged retaliatory act is not usually a sufficient condition to infer a causal link unless the timing is "unusually suggestive of retaliatory motive.  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  "When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus."  Id. at 503-04.

Here, Plaintiff's complaint contains no factual allegations regarding the timing of his complaints to Human Resources.  Nevertheless, Plaintiff has alleged that after he made the complaints to Human Resources, the harassment "became worse."  Further, Plaintiff claims that employees who did not make complaints were not subject to the types of harsh treatment—including being assigned to heavier, more difficult work—that Plaintiff was.  (Compl. ¶¶ 22, 27.)  While Plaintiff may not ultimately be able to establish the facts necessary to succeed on his retaliation claim, at this stage of the litigation, viewing the facts in the light most favorable to Plaintiff, I find that he has plausibly pled a retaliation claim.

---

[1] In reaching this conclusion, I also considered that the term "nigger" is defined as "[a] dark-skinned person of sub-Saharan African origin or descent."  See "Nigger," Oxford English Dictionary, www.oed.com (last visited Feb. 9, 2012).

C.     **Preemption and Failure to State a Claim for Intentional Infliction of Emotional Distress ("IIED")**

Finally, Defendant argues that the Pennsylvania Workers Compensation Act ("PWCA") preempts Plaintiff's IIED claim and that, in any event, Plaintiff has failed to state a claim for IIED.

It is well-established that, under Pennsylvania law, the PWCA is the exclusive remedy available to employees against employers for work-related injuries. Lassiter v. Children's Hosp. of Phila., 2008 WL 304891, at *13 (E.D. Pa. Jan. 31, 2008); see also 77 P.S. § 481(a) (stating that employer liability under the PWCA's provisions "shall be exclusive and in place of any and all other liability to [an] employe"). The PWCA's exclusivity provision is far-reaching: it preempts common law torts "in matters arguably connected with work-related injuries." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 160 (3d Cir.1999) (citing Winterberg v. Transp. Ins. Co., 72 F.3d 318, 322 (3d Cir.1995)). Nevertheless, the PWCA carves out a "personal animus" exception for acts "intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment relationship." 77 P.S. § 411(1); see also, e.g., Mahoney v. Lancaster Cnty Motors, 2006 WL 1284951, at *3 (E.D. Pa. May 8, 2006). Courts have interpreted the personal animus exception as allowing claims where "the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship." Lassiter, 2008 WL 304891, at *13.

The racial insults and harassment Plaintiff alleges occurred only at work, and were primarily related to his job. For example, Plaintiff claims that his supervisor told him to "pick up the pace nigger," and assigned him to "heavier, more difficult battery orders" in an attempt to keep him from meeting his quotas. (Compl. ¶¶ 20(a), (d).) In addition, while the supervisor's comments "I'm not

gonna let that nigger have this job" and "I ain't letting that nigger pass his evaluation" may arguably have been motivated by personal animus, they were nevertheless job-related.  I therefore conclude that the alleged harassment arose out of the employment relationship and is thus preempted by the PWCA.  See Mahoney, 2006 WL 1284951, at *4 (dismissing IIED claim where "the discrimination is alleged to have occurred in the workplace and is tied closely to the employer-employee relationship").

In any event, I also conclude that Plaintiff has failed to state a claim for IIED under Pennsylvania law.  To prove the tort of IIED, Plaintiff would have to show, among other things, that the Defendant engaged in "extreme or outrageous" behavior.  Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988).  The Pennsylvania Supreme Court has noted that IIED is reserved for only "ultra extreme conduct."  Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998).  As the Third Circuit has observed, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery" for IIED.  Cox, 861 F.2d at 395. Moreover, "the cases in our district have consistently held that highly provocative racial slurs and other discriminatory incidents do not amount to actionable outrageous conduct," despite their reprehensibility.  Coney v. Pepsi Cola Bottling Co., 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997).  Because Plaintiff's complaint consists of incidents in which his supervisors subjected him to "highly provocative racial slurs" and "discriminatory incidents," I hold that Plaintiff has failed to state a claim for IIED.

## IV.    Conclusion

Because Plaintiff's IIED claim is preempted by the Pennsylvania Worker's Compensation Act, and because Plaintiff's complaint fails to state a claim for IIED, the motion to dismiss will be

granted in part.  However, to the extent that Defendant seeks to have Plaintiff's claims for national

origin discrimination and retaliation dismissed, the motion will be denied.

Our Order follows.