IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

CRAIG FRAZIER,                      :        CIVIL ACTION
                                    :
                    Plaintiff,      :
                                    :
        v.                          :        No. 11-1863
                                    :
EXIDE TECHNOLOGIES,                 :
                                    :
                    Defendant.      :
_____:


Goldberg, J.                                        November 8, 2016

## MEMORANDUM OPINION

Plaintiff, Craig Frazier, an African-American man, alleges that while he was employed by Defendant, Exide Technologies ("Exide"), his supervisor subjected him to discriminatory treatment and then retaliated against him when he complained about that treatment. Presently before me is Exide's motion for summary judgment.[1] For the reasons stated below, Exide's motion will be granted as to Plaintiff's hostile work environment and disparate treatment claims but denied as to Plaintiff's retaliation claim.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed unless otherwise indicated:

Exide manufactured "lead-acid batteries primarily for transportation." (Def.'s Ex. F, Dec. of James Sweeney ¶4.) Exide prepared batteries for shipment at a distribution center located in Reading, Pennsylvania. The distribution center closed on June 15, 2010. The distribution center's

_____

[1] After the summary judgment motion had been fully briefed, this case was stayed on June 24, 2013 in light of the fact that Exide filed for bankruptcy. On February 22, 2016, the stay was lifted upon notice from the parties that those proceedings had been resolved.

employees were laid off and not offered employment at other Exide locations. (Def.'s Mot. Ex. E, William Halcin Dep. 42:13-43-5; Ex. D, Frank Eaddy Dep. 11:7-10; Exhibit G, Dominic Calvaresi Dep. 10:20-22.)

While in operation, there were seven packaging lines at the Reading distribution center. Depending on the nature of the order being packaged, each packaging line was staffed by one to four "finishers." Finishers were responsible for testing and labeling batteries and then packaging the "finished" batteries for shipment. (Sweeney Dec. ¶¶ 4-6, 9).

During the relevant time period, Exide maintained a "temp-to-hire" program by which temporary employees could be considered for full-time permanent employment after working 400 hours. If offered permanent employment, these employees were placed on probationary status for three additional months. According to James Sweeney, Director of Exide's Human Resources Department, employees were offered membership in the Local Steelworkers Union if their performance was satisfactory during the probationary period. (Def.'s Mot. Ex. F, Sweeney Dec. ¶¶ 8-10.) However, according to Dominic Calvaresi, a "lead" finisher, employees "automatically" became a member of the union upon being hired to a full-time position. (Calvaresi Dep. 51:22-25.)

In April of 2007, Plaintiff was assigned by a temporary employment agency to work as a finisher on the second shift (2:30 p.m. to 11:00 p.m.) at the Reading distribution center. (Def.'s Mot. Ex. F, Sweeney Dec. ¶¶ 8-10.) Calvaresi was assigned to oversee the training and work performed by temporary employees during the second shift. (Pl.'s Resp. Ex. B, Calvaresi Dep. 15:7-1.) Plaintiff described his experience working the second shift as a "happy family" and denies experiencing any "mistreatment" on the second shift. (Pl.'s Resp. Ex. A-1, Frazier Dep. 192:14-193:19.) However, Plaintiff also testified that three black women quit during his first

week of his temporary employment. Plaintiff acknowledged that he did not know why they quit. (Frazier Dep. 204:2-8.)

After working 400 hours as a temporary employee, Plaintiff applied for and received a permanent position as a finisher. (Id. at 114:24-115:23, 117:4-16.) On what appears to have been his first day of his permanent employment, August 1, 2007, Plaintiff received and read Exide's "Harassment in the Workplace" policy. Plaintiff understood that if he had a workplace problem he should go to his supervisor or someone within the Human Resources Department. (Frazier Dep. 124:20-125:19.) Exide also had anti-discrimination posters hanging in the cafeteria and next to the time clock. Plaintiff claims not to have seen these posters. (Sweeney Dec. ¶17; Calvaresi Dep. 53:25-54:3; Frazier Dep. 123:17-124:7.)

Once hired as a permanent employee, Plaintiff worked exclusively on the "first shift," which ran from 6:00 a.m. to 2:30 p.m. The first shift was supervised by William "Billy" Halcin, who is white. Prior to switching to the first-shift, Plaintiff had no interaction or contact of any kind with Halcin. (Def.'s Mot. Ex. C, Halcin Dec. ¶2; Frazier Dep. 119:20-120:3.)

During his first five weeks of permanent employment, Plaintiff was absent three times. Plaintiff also received a "verbal" and a "written" disciplinary warning for making two quality errors in September 2007. (Def.'s Mot. Exs. I, J.) Plaintiff admits that he does not have any basis for believing that these warnings were motivated by racial discrimination. (Frazier Dep. 107:17-108:6.) At some point during this period, Halcin said to Plaintiff "I don't think you are going to make it." Regarding his comment, Plaintiff testified that Halcin "had no reason to come and harass me like that." (Frazier Dep. 135:10-13.)

Plaintiff contends that he was assigned a greater number of "heavy" batteries to "finish"

than his non-black co-workers.[2] Although he testified that he does not know how the battery assignments were made, Plaintiff maintains that Halcin had a role in what he believes was his disproportionate share of heavy battery assignments. (Frazier Dep. 86:1-88:1, 97:12-98:3, 141:9-142-16.) Plaintiff did not provide any specific data regarding his assignments to support his perception that he received more heavy battery assignments than other workers. Plaintiff did, however, testify that Frank Eaddy, an African-American "material handler" and president of Exide's union, told Plaintiff that Halcin was discriminating against Plaintiff because of his race. (Frazier Dep. 151:12-15.) When asked to state "every word that Frank [Eaddy] said to you that you believe support that Billy was discriminating against you because of your race," Plaintiff responded that "Frank [Eaddy] said watch your back." (Frazier Dep. 150:14-152:18.) In his recounting of this conversation, Eaddy did not state that he made the foregoing comments to Plaintiff. (Eaddy Dep. 34:17-36:4.)

Eaddy described the process by which battery assignments were made as follows: at the beginning of a shift, the supervisor, such as Halcin, would distribute the day's orders to the various lines and to the "material handlers" or pickers. The material handlers were responsible for transporting the appropriate unfinished batteries from the storage areas to the lines. Eaddy testified that he and Halcin worked together to ensure that orders with heavy batteries were distributed equally to the lines. Although Halcin made the assignments in the first instance, Eaddy was empowered to equitably distribute the workload to minimize injury and also maximize the chance that all the employees would receive the group incentive bonus, which was

---

[2] Exide finished large batteries mainly used in vehicles. Exide employees referred to the larger batteries, which weighed approximately 150 pounds, as "heavy batteries." (Sweeney Dec. ¶4; Eaddy Dep. 16:3-7.) Given their size, no more than 12 "heavy batteries" were loaded on a single pallet. (Halcin Dec. ¶ 18.)

given by Exide if all employees met their quotas. (Pl.'s Resp. Ex. E, Eaddy Dep. 28:5-29:20, 15:3-10; see also Halcin Dec.¶¶12-14.)

Exide submitted production records from September 1, 2007 through October 15, 2007 and also a summary of these records. (Def.'s Mot. Exs. C-1 to C-2-5, Production Records.) The summary documents the total number of batteries assigned to each finisher as well as the number of heavy batteries assigned to each finisher. It then calculates each employee's assignment of heavy batteries as a percentage of the total batteries assigned to each finisher. (Id. at Ex. C-1.) The summary lists twenty-seven employees, nine of whom had been given a higher percentage of heavy battery assignments than Plaintiff. (Id.)

At some point during his probationary period, Plaintiff complained to Eaddy that he was receiving more heavy battery assignments than the other finishers. Eaddy responded that there was nothing he could do as Plaintiff was not yet a member of the union but he nonetheless promised to "keep an eye out" and speak with Halcin if he observed a problem. According to Eaddy, the finishers routinely complained to Eaddy about being assigned heavy batteries. (Eaddy Dep. 34:22-36:9, 46:16-47:4.)

Towards the end of the first shift on October 16, 2007, Plaintiff incorrectly loaded a pallet of batteries.[3] Plaintiff neglected to place a wood board under the pallet so that it would properly roll down the line after it was loaded. Plaintiff stated as he was preparing to push the pallet down the line, Halcin alerted him to the problem. Plaintiff testified that Halcin must have watched him load the entire pallet before informing him of the error because once the pallet was loaded it was impossible to see whether or not there was a board under the pallet. Plaintiff admits

---

[3] The parties refer to this event as the "pallet incident" or the "skid incident." For ease of reference, I will refer to this event at the "pallet incident."

that he made an error but urges that Halcin maliciously waited to inform him of the error until after he had finished loading the entire pallet. (Frazier Dep. 15:21-160:22.)

The next morning before the start of the shift, Plaintiff approached Halcin to discuss the pallet incident and asked Halcin "is it something I'm doing wrong?" Plaintiff asserts that Halcin responded "you need to pick up the pace nigger." (Id. at 163:15-168:18.) Although Plaintiff asserts that his exchange occurred in front of several other employees, there is no evidence regarding those individuals or their recollection of the exchange.

Plaintiff retrieved his belongings from his locker and left the building. As he was leaving, Plaintiff states that he told Eaddy and another co-worker, Butch Watson, "fuck that, I ain't got to put up with this shit" as he walked out the door. Plaintiff "doesn't think" he told Eaddy and Watson that Halcin used the word "nigger." (Id.) Eaddy testified that Watson relayed that Plaintiff had said that Halcin had used the word "nigger." (Eaddy Dep. 24:20-24; 27:1-6.)

Halcin denies ever using the term "nigger." (Halcin Dep. 105:1-18.) Both Eaddy and Calvaresi testified that they never heard Halcin use the term. (Eaddy Dep. 23:19-25; Calvaresi Dep. 43:11-15.) Sweeney similarly testified that "I have never received a complaint of race discrimination concerning Mr. Halcin, nor have I ever been aware of him using racially-charged language of any kind." (Sweeney Dec. ¶13.)

At the time, Plaintiff was aware that walking off the job was a "terminable offense" at Exide. (Sweeney Dec. ¶21; Frazier Dep. 169:21-24.) The following morning, Plaintiff went to see Sweeney. According to Plaintiff, he told Sweeney about the pallet incident and Halcin's comments the previous morning.[4] Although Plaintiff testified that he told Sweeney "about the

_____

[4] The only evidence of what was said at this meeting comes from Plaintiff. Although Sweeney's declaration states that Plaintiff "appeared in my office on October 18, 2007 to complain about Mr. Halcin," it does not describe what Plaintiff said during that conversation. (Sweeney Dec.

unjust treatment I was getting," it is unclear whether Plaintiff conveyed to Sweeney his complaints regarding the battery assignment issue. This was the first time Plaintiff ever reported any misconduct to Sweeney.  (Frazier Dep. 172:5-174:6.)

According to Plaintiff, Sweeney then told him to go home and that he would call Plaintiff the following day. Instead, Plaintiff returned to Exide the next day and was advised by Sweeney's assistant that he had been fired. (Id. at 173:20-174:6.)

In support of his opposition to the motion for summary judgment, Plaintiff also offered the deposition of Kissy McLaurin, Plaintiff's friend and former Exide employee. McLaurin was placed at Exide as a temporary employee for approximately a month at some point in early 2007. (Pl.'s Resp. Ex. C, Kissy McLaurin Dep. 54:6-59:11.) Her testimony regarding the timing and duration of her employment was inconsistent and vague. As such, it is unclear when and for how long she was actually employed at Exide.

McLaurin testified that Halcin once remarked that "niggers do not know how to drive" when he was standing four to five feet from her. She claimed that this statement was not directed at anyone in particular and that Halcin was walking up and down the line at the time he made the remark. McLaurin also asserts that Halcin called "Spanish" workers "Spics." McLaurin testified that Halcin once also said "come here, Nigger" to Plaintiff when she and Plaintiff were having a

---

¶20.) However, as noted above, Sweeney's declaration does assert "I have never received a complaint of race discrimination concerning Mr. Halcin, nor have I ever received a report of, or been aware of, him using racially-charged language of any kind." (Id. at ¶13.) Presumably this statement means that Sweeney did not receive a report of race discrimination concerning Halcin from Plaintiff at any point as well. In fact, in its motion, Exide denies that Plaintiff complained to Sweeney that Halcin had used the word "nigger." (Def.'s Mot. p. 7 n.1.) However, Exide's assertion is not evidence. To this end, Exide appropriately recognizes that, for purposes of this motion, it must be assumed that Plaintiff did in fact complain to Sweeney about this specific incident.

smoke break.[5] McLaurin states that Plaintiff did not say anything in response. McLaurin seems to suggest that Plaintiff did not hear the comment. McLaurin admits that she did not report any of these comments to a supervisor or Human Resources. She also testified that she did not tell Plaintiff, prior to his termination, about any of the comments she claims Halcin made. (McLaurin Dep.71:2-77:6; 79:3-82:3; 79:3-82:3.)

Plaintiff's testimony confirms that he did not hear any of the comments McLaurin claims Halcin made. In fact, Plaintiff testified that outside of the comment on October 17, 2007 and Halcin's comment that he didn't believe that Plaintiff "would make it" he could not recall Halcin saying anything else objectionable. At another point in his deposition, Plaintiff stated that he never heard Halcin say "anything discriminatory" until the last day of his employment. (Frazier Dep. 181:14-25, 134:16-23.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions,

---

[5] McLaurin's testimony is hard to follow at points. From what I can glean, it appears that McLaurin ceased working at Exide in March or April of 2007. Plaintiff was not placed at Exide until April 2007 and worked the second-shift until August 2007. As noted above, the record is clear that Halcin never worked the second shift and had no contact with Plaintiff until August 2007. Therefore, it is unclear when, if at all, Halcin and Plaintiff would have interacted during McLaurin's brief employment at Exide.

8

conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

Exide has moved for summary judgment on all of Plaintiff's claims. For the reasons stated below, Exide's motion will be granted as to Plaintiff's hostile work environment and disparate treatment claims but denied as to Plaintiff's retaliation claim.

### A.  Hostile Work Environment Claim

Title VII provides that it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to compensation, terms, conditions or privileges

9

of employment because of such individual's race, color, religion, sex or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Racial harassment that creates an abusive and hostile work environment is actionable under Title VII. Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986).

To establish a racially hostile work environment, a plaintiff must show: 1) that they suffered intentional discrimination because of their race, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." Id.

Regarding the second element of the hostile work environment claim, Exide argues that there is insufficient evidence on which a reasonable jury could conclude that the alleged harassment was severe or pervasive.

When a workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" Title VII is violated. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002). "[S]imple teasing, offhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citations omitted) (the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code").

10

"Although the bar for establishing severe or pervasive discrimination is relatively high, the determination of what constitutes severe or pervasive does not lend itself to a mathematically precise test." Booker v. Nat'l R.R. Passenger Corp., 880 F.Supp.2d 575, 582 (E.D. Pa. 2012). As such, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris, 510 U.S. at 23). A hostile work environment can be "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117; see also Cardenas v. Massey, 269 F.3d 251, 261-62 (3d Cir. 2001). Therefore, a district court may not parse out individual incidents but rather must evaluate the alleged hostile work environment as a whole. Mandel, 706 F.3d at 168.

Plaintiff urges that the following evidence is sufficient to create a genuine issue of material fact regarding the severe or pervasive element: that (1) Plaintiff received a disproportionate share of the finishers' heavy battery assignments; (2) Halcin told Plaintiff "I don't think you are going to make it"; (3) the pallet incident; and (4) Halcin's statement directed at Plaintiff to "pick up the pace nigger."[6] Plaintiff urges that the foregoing evidence of a racially hostile work environment is corroborated by the comments Kissy McLaurin attributes to Halcin.

As a threshold matter, I conclude that (1) there is no evidence in the record to support Plaintiff's claim that he was given a greater share of heavy battery assignments than other employees, and (2) that McLaurin's testimony is of limited relevance to the questions before me.

---

[6] While Exide notes that Halcin denies making this statement, it correctly recognizes that for purpose of this motion, it must be accepted as true. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

i.   <u>Evidence Regarding the Battery Assignment Issue</u>

Regarding the battery assignment issue, Exide urges that Plaintiff has not produced any evidence to support his conclusory assertion that he was assigned more than his share of heavy batteries and that Halcin's decision to make these unfair assignments was motivated by race. I agree with Exide.

First, Plaintiff admits that he does not know how the battery assignments were made or what role Halcin played in the assignment process. The record evidence establishes that while distribution center supervisors, including Halcin, assigned work orders to the lines in the first instance, the material handlers or pickers such as Eaddy, worked to "spread [heavy battery assignments] across the board equally." (Eaddy Dep. 28:5-29:20.) Furthermore, Eaddy clearly stated that Halcin did not have the ultimate or final say in which finisher was assigned what batteries.

Second, Plaintiff's belief that he was assigned an inordinate number of heavy batteries is unsupported by any evidence in the record. Rather, the evidence, namely Exide's production records, demonstrates that Plaintiff was not assigned heavy batteries at rates higher than his coworkers. In fact, a third of the finishers were given higher percentages of heavy battery assignments than Plaintiff. In his opposition to Exide's motion for summary judgment, Plaintiff did not respond to or dispute this evidence in anyway. Plaintiff's unsupported belief regarding the battery assignment issues is insufficient to create a genuine issue of fact as it relates to his hostile work environment claim.

In the context of a disparate treatment claim, courts in this district have reached similar conclusions regarding a plaintiff's unsupported belief that he was receiving more difficult job assignments. In <u>Woodard v. PHB Die Casting</u>, 2005 WL 3093180 (W.D. Pa. Nov. 18, 2005)

aff'd, 255 F. Appx. 608 (3d Cir. 2007). In Woodard, an African American plaintiff testified that he believed that he was assigned to "more difficult jobs" than his white coworkers. Id. at *7. The defendant employer produced a spreadsheet identifying the assignments plaintiff and other employees received during the relevant time period. Id. This spreadsheet demonstrated that "white employees . . . were assigned to the same jobs and machines as [plaintiff] during shifts preceding and following [plaintiff's] shift." Id. As the plaintiff failed to offer any evidence to support his "conclusory allegation," the Court found that the plaintiff had "not raised a triable issue of fact as to whether he was assigned to difficult jobs more frequently than his white employees." Id. at *7 n.2, *8.

ii.   Relevance of Kissy McLaurin's Testimony

As noted above, McLaurin testified that she overheard Halcin make multiple racially offensive comments in the workplace, including one incident where Halcin referred to Plaintiff, in Plaintiff's presence, as a "nigger." However, McLaurin explained that she did not tell Plaintiff about any of these comments, including the incident in which McLaurin claims that Halcin directed a racial epithet at Plaintiff. Consistent with McLaurin's testimony, Plaintiff testified that he was only aware of Halcin making two "harassing" statements – "I don't think you are going to make it" and "pick up the pace nigger" – during this tenure at Exide.[7]

---

[7] I also note that Plaintiff's deposition testimony seems to suggest that he did not perceive the first purportedly "harassing" comment to be "discriminatory." (Frazier Dep. 134:16-23.) The relevant portion of Plaintiff's testimony is as follows:

Q.   You never heard Bill Halcin say anything discriminatory until the last day of your employment?

A.   To me? I never heard him say anything to me discriminatory.

Q.   Ok. Until the last day of your employment?

"[E]vidence of harassment of other employees about which the plaintiff was aware during her employment (whether the plaintiff witnessed the events or simply had knowledge of them) [may] contribute to the 'general working environment.'" Hallberg v. Eat'n Park, 1996 WL 182212, at *10 (W.D. Pa. Feb. 28, 1996); Velez v. QVC, 227 F.Supp.2d 384, 410 (E.D. Pa. 2002) (incidents involving other employees are relevant to the severe or pervasive analysis provided that the plaintiff was "aware of the incidents during . . . her term of employment, and that, under the circumstances of the case, there is a nexus between the discrimination directed at him or her, and that directed at others.") Additionally, "[c]omments not directed at a plaintiff or uttered out of a plaintiff's presence may be considered in determining whether 'facially neutral' conduct was actually based on a plaintiff's race." Caver v. City of Trenton, 420 F.3d 243, 264 (3d Cir. 2005).

As Plaintiff was unaware of the comments McLaurin attributes to Halcin, I conclude that the incidents which McLaurin describes are not directly probative of whether Plaintiff perceived the workplace to be hostile. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993) ("if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation"). However, McLaurin's testimony may provide some context for assessing whether Halcin's facially neutral

---

A.      Right.

Q.      Did he say something on the last day of your employment?

A.      Yes. He called me nigger my last day of my employment.

Q.      But prior that time you never heard him say anything discriminatory?

A.      He was just harassing me. Just harassment back then.

(Frazier Dep. 134:16-135:6.)

conduct – the "pallet incident" and the "I don't think you are going to make it" comment – were actually based on Plaintiff's race.

       iii.  <u>Remaining Evidence</u>

Given the United States Court of Appeals for the Third Circuit's directive not to parse individual incidents, I have considered the pallet incident, the "pick up the pace nigger" comment and the "I don't think you are going to make it" comment in total. I have considered this evidence within the additional context provided by McLaurin's testimony. The question before me is whether a reasonable jury could conclude that the foregoing conduct taken as a whole was sufficiently severe or pervasive as to create an abusive workplace environment.

Exide urges that Halcin's comments cannot sustain a racially hostile work environment claim. In opposition, Plaintiff responds that in its brief Exide cites:

> no factually similar case where a court entered summary judgment when a supervisor's use of the word "nigger" directed at the employees and the employee's termination were virtually simultaneous events (as they are here). <u>The reason Exide's brief cites no such case is that no such case exists.</u> Instead, the timing, context, and hostility of Halcin's vile utterance is so objectionable that no court could ever find it to be "off-hand" "stray" or otherwise inconsequential. In fact, such a contention is absurd.

(Pl.'s Resp. p. 7 (emphasis in original.))

Contrary to Plaintiff's assertion, other district courts have found that the isolated use of the racial epithet "nigger" does not create a hostile work environment. For example, in <u>King v. City of Philadelphia</u>, 66 Fed. Appx. 300 (3d Cir. 2003), the Third Circuit affirmed the district court's grant of summary judgment on the basis that the use of the word "nigger", one physical push, and one threat to sabotage plaintiff's work record are "isolated and sporadic incidents" and do not demonstrate a pervasive atmosphere of harassment.

In a comparable case, <u>Morgon v. Valenti Mid-Atlantic Management</u>, 2001 WL 1735260

(E.D. Pa. Dec. 14, 2001), the district court granted summary judgment in favor of the defendant employer. Id. at *4. The plaintiff, "a black female of Jamaican national origin," offered evidence that during the one year in which she had worked for the defendant "there were two incidents-one in June of 1999 where [a supervisor] allegedly called plaintiff a nigger, and the other on August 28, 1999 when [another employee] made [a] comment about not hiring Jamaicans. Plaintiff was called illiterate and described an assault upon her by [the other employee]." Id. at *3. The Court concluded that "it instantly becomes clear from a review of the[se] facts" that the harassment described was not severe or pervasive. Id. at *3.

Courts have found that the utterance of the word "nigger" in a plaintiff's presence on several occasions when coupled with other conduct is sufficient to withstand summary judgment. In Williams v. Mercy Health Systems, 866 F. Supp. 2d 490 (E.D. Pa. 2012), the district court held that the "use of the word 'nigger' on three occasions, combined with defendants' other alleged discriminatory remarks" was sufficient to withstand summary judgment. Id. at 502. In reaching this conclusion, the district court emphasized that one of the uses of the word "nigger" allegedly occurred during the plaintiff's performance meeting, where defendants decided to terminate the plaintiff's employment. Id. at 502 n.10.

In his response, Plaintiff urges that the facts in Webb v. Merck & Co., 450 F. Supp. 2d 582 (E.D. Pa. 2006) are "consistent with those in the pending matter." (Pl.'s Resp. p. 11.) The court in Webb recounted the evidence of harassment as follows:

> over the period of one year, plaintiff [Green] was subject to a hostile and intimidating white supervisor who referred to himself as a "zookeeper" overseeing an all-African American crew. Green testified, and [the defendant] never rebutted, that Green was disciplined harshly by [the supervisor] while watching his white co-workers receive no discipline for similar or more severe mistakes. Green was given no relief when he complained through the proper channels about his supervisor's zookeeper comments. Rather, the supervisor's behavior became increasingly inappropriate, resulting in Green's suspension for a

16

fabricated error. Green also learned that the supervisor was making repeated references to Green and the other African–American men on his shift as "my animals," instructing his colleagues on how to "attend" to them while he was [on] vacation, and telling them that they should not feed his charges any "raw meat" because he "had a heck of a time getting them back on a dry food diet the last time."

Id. at 598. The district court concluded that "[g]iven this pattern of behavior over the course of a year, . . . a reasonable jury could determine that this conduct is sufficiently abusive, humiliating, and intimidating to constitute severe or pervasive harassment." Id.

Plaintiff accurately notes there was no allegation that the supervisor in Webb used the word "nigger." On this basis, Plaintiff urges that the case before me arguably involves more serious allegations than those made in Webb. However, unlike the record before me, the record in Webb involved an ongoing pattern of racially motivated conduct, disparate disciplinary outcomes, and repeated comments concerning plaintiff's race which occurred over a one year period. The plaintiff in Webb also offered evidence that the employer failed to take any remedial action even though the plaintiff had complained to management through the prescribed channels.

Taking the pallet incident and Halcin's comments together and viewing such evidence in the light most favorable to Plaintiff, I find that, as a matter of law, there is insufficient evidence from which a reasonable jury could find that the harassment was severe or pervasive. A single incident of employee discipline for an undisputed error – i.e., the pallet incident – does not elevate one highly offensive comment and one somewhat neutral comment into a hostile work environment. This analysis remains the same even taking into account McLaurin's testimony.

The Third Circuit has made clear that "[h]ostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere." Drinkwater v. Union Carbide Corp., 904 F.2d 853, 863 (3d Cir. 1990). Halcin's alleged comments, if true, are reprehensible. However, such comments, even when viewed in

conjunction with the pallet incident, do not demonstrate a continuous period of harassment nor do these facts create an atmosphere. For these reasons, Plaintiff's case is more akin to <u>King</u> or <u>Morgon</u> than <u>Webb</u> or <u>Williams</u>. As Plaintiff has failed to offer sufficient evidence on which a reasonable jury could find that the workplace was permeated with harassment, judgment in Exide's favor on Plaintiff's hostile work environment claim is appropriate.[8]

**B. Disparate Treatment Claim[9]**

"A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." <u>E.E.O.C. v. Metal Serv. Co.</u>, 892 F.2d 341, 347 (3d Cir. 1990). Generally, a prima facie case of employment discrimination requires a showing that: (1) he is a member of a protected class; (2) he was qualified for the position in question; (3) he suffered an adverse employment action; and (4) that adverse employment action

---

[8] Exide also argued that it is entitled to summary judgment on Plaintiff's hostile work environment claim under the defense established in <u>Faragher v. Boca Raton</u>, 524 U.S. 775 (1998) and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998). (<u>See</u> <u>id.</u> (where a supervisor's harassment does not result in a tangible employment action, the employer may raise an affirmative defense by showing "an employer can mitigate or avoid liability by showing (1) that it "exercised reasonable care to prevent and promptly correct any harassing behavior" and (2) that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities" that were provided.) As I have concluded that Plaintiff has failed to offer sufficient evidence on the severe or pervasive element, I need not consider Exide's argument regarding the <u>Ellerth</u>/<u>Faragher</u> defense.

[9] The Complaint also pleads Title VII claims based on national origin. In its motion for summary judgment, Exide argues these claims should be dismissed for the same reasons as Plaintiff's race discrimination claims. Exide further notes that Plaintiff admitted during his deposition that he is of "American" national origin. (Frazier Dep. 116:5-7 ("Q. Are you originally from Africa? A. I'm America. I'm American. I'm an American."))

As Plaintiff does not present any argument regarding national origin discrimination in his response in opposition to Exide's motion for summary judgment, it does not appear that he is still pursuing these claims. Regardless, I agree with Exide that summary judgment is appropriate on Plaintiff's national origin claims for the reasons discussed in the context of his race discrimination claims.

"give[s] rise to an inference of unlawful discrimination." <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410-11 (3d Cir. 1999). An adverse employment action is one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Cardenas</u>, 269 F.3d at 263 (citing <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3d Cir. 1997)).

Exide argues that it is entitled to judgment on Plaintiff's disparate treatment claim because there is no evidence that Plaintiff was subject to an adverse employment action. Based on the Complaint and Plaintiff's response to Exide's motion for summary judgment, it is unclear what theory Plaintiff is pursuing in support of his disparate treatment claim. There is some basis in his submissions to believe that he might be claiming that one or more of the following constitute adverse employment actions: (1) the fact that he was given a disproportionate share of heavy battery assignments; (2) his "constructive discharge;" or (3) his actual termination. Given this uncertainty, I will address whether Plaintiff has offered sufficient evidence in support of any of these three theories to withstand summary judgment.

As discussed above in the context of the hostile work environment claim, Plaintiff has not proffered any actual evidence that demonstrates that he was given a disproportionate share of heavy battery assignments. Therefore, his disparate treatment claim cannot withstand summary judgment on the theory that he was given disproportionately difficult assignments.

Plaintiff's constructive discharge theory, wherein he suggests that the harassment he experienced was so severe or pervasive that he was forced to resign by walking off the job, also fails as a matter of law. In order to establish a constructive discharge, a plaintiff must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." <u>Aman v. Cort Furniture Rental Corp.</u>, 85

F.3d 1074, 1084 (3d Cir. 1996) (citing Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984). "Intolerability" is "not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998). Rather, intolerability is assessed by the "objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign,-that is, whether he would have had no choice but to resign." Id. (quoting Blistein v. St. John's College, 74 F.3d 1459, 1468) (4th Cir. 1996)). "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006) (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)).

As noted above, Plaintiff failed to produce sufficient evidence on which a reasonable jury could base a finding that the harassment was severe or pervasive. As the standard for proving constructive discharge is higher than the standard for demonstrating a hostile work environment, Plaintiff has failed to proffer sufficient evidence on his constructive discharge theory.

Additionally, Plaintiff testified that he did not intend to resign and he returned to work the next day to apologize and find out whether he was able to continue working at Exide. Plaintiff also acknowledges that he was terminated. (Frazier Dep. 169:21-172:2, 177:13-16.)

Constructive discharge refers to a situation in which an employee is not terminated but resigns. See, e.g., Espinosa v. Cty. of Union, 2005 WL 2089916, at *11 (D.N.J. Aug. 30, 2005) aff'd, 212 F. Appx. 146 (3d Cir. 2007); Mackenzie v. Potter, 219 Fed. Appx. 500, 503 (7th Cir.

2007) (plaintiff "did not show that she was <u>constructively</u> discharged because she was <u>actually</u> fired") (emphasis in original); <u>Jordan v. City of Gary</u>, 396 F.3d 825, 836-37 (7th Cir. 2005) ("We can make it no plainer than to reiterate that constructive discharge refers to a situation in which an employee is not fired but quits.") Therefore, Plaintiff's disparate treatment claim cannot survive summary judgment under the theory that he suffered an adverse employment action in the form of constructive discharge.

Lastly, I address whether Plaintiff's actual termination of his employment by Exide constitutes an actionable adverse employment action. Plaintiff does not explicitly make this argument in his response to Exide's summary judgment motion. However, in the context of his retaliation claim, Plaintiff argues that his termination was motivated by race rather than the fact that he walked off the job. A reasonable extension of this argument is that Plaintiff contends that other employees at Exide were not subject to termination when they committed comparable offenses.

In order for such a theory to be viable, Plaintiff would need to point to evidence demonstrating that other similarly situated employees outside of the protected class were disciplined less severely for comparable conduct. See <u>McCullers v. Napolitano</u>, 427 F. Appx. 190, 195 (3d Cir. 2011) (quoting <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-18 (7th Cir. 2000)) ("In this particular context—workplace disciplinary actions—relevant factors include a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'")

There is no evidence in the record regarding any other employees who had walked off the job or committed any comparable offenses. As Plaintiff has failed to offer any such evidence, he

cannot proceed with his disparate treatment claim under the theory that he was disciplined more harshly than other employees for walking off the job because of his race.

For the reasons discussed above, Exide is entitled to summary judgment on Plaintiff's disparate treatment claim.

### C.  Retaliation

Plaintiff contends and I agree that his retaliation claim should be analyzed under the three-step, burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). First, to establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995). If the employee establishes this prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Moore, 461 F.3d at 342 (internal citations omitted). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." Id.

i.  Protected Activity

Plaintiff urges that he engaged in activity protected by Title VII when he reported to

Sweeney "that Halcin had used the word 'nigger.'" (Pl.'s Resp. p. 24.)[10] Exide responds that "there is no evidence that Plaintiff ever engaged in 'protected activity' for purposes of establishing a retaliation claim because Plaintiff did not have a reasonable, good faith belief that he was being discriminated against on the basis of his race." (Def.'s Mot. p. 20.)

"With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause.')" Moore, 461 F.3d at 341 (citing Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006). Acceptable forms of protected activity under Title VII's opposition clause can include formal complaints as well as "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges."

---

[10] At points in his response, it appears that Plaintiff is also arguing that his statements to "Butch" and Eaddy regarding Halcin's conduct constitute protected activity. For example in the section of his response addressing his retaliation claim, Plaintiff states "[t]he facts and arguments supporting Frazier's harassment and discrimination claims, and his complaints to both the Union and to Sweeney are incorporated by reference." (Pl.'s Resp. p. 23.) However, the substance of Plaintiff's response is devoted to the complaint he made to Sweeney – not the union representatives.

Nonetheless, to the extent that Plaintiff is pursuing this theory, there is no evidence in the record that Sweeney or any decision maker at Exide was aware of the "complaints" Plaintiff made to Butch and Eaddy. Therefore, based on the record as it stands, a reasonable jury could not conclude that Plaintiff's termination was causally connected to his statements to the union representatives. See Moore, 461 F.3d at 351 ("To the extent that [Plaintiff] relies upon the brevity of the time periods between the protected activity and alleged retaliatory actions to prove causation . . . he will have to show as well that the decision maker had knowledge of the protected activity"); Morris v. Cornell & Co., 2006 WL 2376742, at *5 (D.N.J. Aug. 16, 2006) ("Even if the Court assumes that [the plaintiff's] complaint to a secretary at the union hall is protected conduct, he is unable to establish a prima face case of retaliation because he has not proven that his employer knew of his assumed protected activity or that a causal connection exists between his assumed protected activity and the adverse employment action.")

Barber v. CSX Distribution Servs., 68 F.3d 694, 702 (3d Cir. 1995) (quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)).

"Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." Moore, 461 F.3d at 34. "A plaintiff need only allege discrimination on the basis of race, color, religion, sex, or national origin to be protected from retaliatory discharge under Title VII. Protection is not lost merely because an employee is mistaken on the merits of his or her claim." Slagle, 435 F.3d at 268. However, "[a] general complaint of unfair treatment is insufficient to establish protected activity under Title VII." Curay-Cramer v. Ursuline Acad., 450 F.3d 130, 135 (3d Cir. 2006).

As discussed above, the evidence is insufficient to withstand summary judgment on Plaintiff's hostile work environment and disparate treatment claims. However, that conclusion does not automatically foreclose Plaintiff's ability to pursue a retaliation claim. A reasonable jury could conclude that Plaintiff believed in good faith that the conduct that he was reporting to Sweeney was unlawful under Title VII. I make this conclusion in light of Plaintiff's testimony regarding his perceived "unfair treatment" as well as the fact that a lay person could reasonably believe that Halcin's single utterance was actionable given the historical connotation of the word "nigger."

### ii.   Adverse Employment Action

To show an adverse employment action in the context of a claim for retaliation, a plaintiff must show that a "reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Moore, 461 F.3d at 341 (quoting Burlington, 548 U.S. at

68). Plaintiff states "his employment was terminated, so there is no dispute as to adverse action."

I agree. A termination "clearly fulfills the second prong of the prima facie case for a retaliation claim." Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001).

### iii.   Causation

As to causation, the plaintiff must show that the employer's "desire to retaliate was the but-for cause of the challenged employment action" such that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Thompson v. Kellogg's USA, 619 F. Appx. 141, 144 (3d Cir. 2015) (quoting Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013)).

"Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007). "Where the temporal proximity is not 'unusually suggestive,' we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference." Id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)). "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." Id. at 232-33.

I find that the one day passage of time between Plaintiff's claimed protected activity – the conversation with Sweeney – and his termination is unusually suggestive and, therefore, sufficient standing alone to create an inference of causation and defeat summary judgment. See Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (causation demonstrated where plaintiff's

"discharge followed rapidly, only two days later, upon [the defendant's] receipt of notice of [the plaintiff's] EEOC claim.")

Nonetheless, Exide urges that Plaintiff cannot establish causation because Plaintiff "engaged in terminable behavior and <u>then</u> complained." (Def.'s Reply p. 8 (emphasis in original.)) Exide is correct that it is "well-settled" that when an employer "contemplates an adverse employment action prior to the plaintiff engaging in a protected activity, the employment action itself does not provide evidence of a causal connection for the purposes of a retaliation claim." <u>Mihalko v. Potter</u>, 2003 WL 23319594, at *14 (W.D. Pa. Dec. 12, 2003) (collecting cases).

While the foregoing may be a viable defense at trial, the record does not establish whether Exide resolved to or even contemplated terminating Plaintiff for walking off the job prior to his conversation with Sweeney. The record simply indicates that walking off the job is a "terminable offense." Additionally, nothing before me speaks to whether Exide undertook any deliberative process to determine whether to terminate Plaintiff prior to his purported protected activity. As such, Exide's arguments regarding causation do not support their request for summary judgment.

### iv.   Legitimate Non-Discriminatory Reason

Alternatively, Exide argues that even if Plaintiff has established a prima facie case, Exide has offered evidence of a legitimate non-discriminatory reason for Plaintiff's termination: Plaintiff walked off the job. At this stage, Exide's burden is "relatively light" and it need only "introduc[e] evidence which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perskie</u>, 32 F.3d

26

759, 763 (3d Cir. 1994). I find that Exide has satisfied his burden. As such the burden shifts back to Plaintiff to point to some evidence of pretext.

   v. <u>Pretext</u>

  A plaintiff must point to sufficient evidence from which a fact-finder could reasonably conclude that Exide's proffered reasons were pretextual and the real reason was discriminatory in nature. <u>Fuentes</u>, 32 F.3d at 763. When a plaintiff challenges the "credibility of the employer's proffered justification," he must produce evidence to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer' proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." <u>Id.</u>[11]

  "To survive summary judgment, the plaintiff need only raise doubt as to the legitimacy of the defendant's proffered reason for its adverse action; it need not prove its discrimination case." <u>Andes v. New Jersey City Univ.</u>, 419 F. Appx. 230, 233 (3d Cir. 2011) (emphasis and alteration in original). "At summary judgment, therefore, a court must view these implausibilities, inconsistencies, incoherencies and contradictions, however weak, in the light most favorable to the non-moving party." <u>Id.</u>

  Exide urges that the "only evidence is that Exide employees who walk off the job are subject to immediate termination." However, that fact is not in the summary judgment record before me. The only record evidence on the issue establishes that the offense is "terminable" and that Plaintiff was aware of that fact. Nothing in the record establishes that "terminable" means that an employment is terminated automatically and without consideration when an employee

---

[11] Plaintiff does not cite to a case which suggests that timing alone can demonstrate pretext. My review does not disclose any such precedent. <u>Accord</u> <u>Jackson v. Planco</u>, 660 F. Supp. 2d 562, 581 (E.D. Pa. 2009) <u>aff'd,</u> 431 F. Appx. 161 (3d Cir. 2011).

walks off the job. As I am required to draw all inferences in Plaintiff's favor at this stage, the fact the offense is terminable could mean that by policy or practice Exide engages in some sort of deliberation prior to terminating employment for such an offense or that a degree of discretion accompanies any such decision making. This interpretation is plausible given the fact that Exide did not contact Plaintiff the same day he walked off the job to inform him that his employment had been terminated nor did Sweeney inform Plaintiff that his employment was terminated the following day. Additionally, a reasonable fact-finder could conclude that Exide's failure to investigate the allegations of discrimination prior to exercising its (potential) discretion to fire Plaintiff for the "terminable" offense also supports an inference of pretext.

Considering the foregoing evidence in the light most favorable to Plaintiff as well as the temporal proximity between the protected conduct and Plaintiff's termination, I find that there is a genuine issue of material fact as to whether Exide's proffered legitimate non-discriminatory reason was in fact pretextual.

### D.  Lost Wages

Lastly, Exide argues that to the extent that any of Plaintiff's claims survive summary judgment, Plaintiff's lost wages should be cut off as of the date that the Reading distribution center closed.[12] Exide notes that Halcin, Calvaresi and Eaddy all testified that they were discharged as a result of the distribution center closure on June 15, 2010.

This Court has recognized that a plaintiff's back pay award should be limited to the period in which the defendant employer remains in operation. See Helbling v. Unclaimed Salvage & Freight Co., 489 F. Supp. 956, 963 (E.D. Pa. 1980) (concluding that the plaintiff's back pay award "must be based on the period running from the date she should have been

---

[12] Plaintiff did not respond to this argument.

promoted to manager to the date the store closed the period it can be assumed she would have held the job to which she was entitled"); accord Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 605 (E.D. Pa. 1989) aff'd, 922 F.2d 184 (3d Cir. 1990) ("if plaintiffs would have been laid off for permissible reasons sometime [point after their termination], then plaintiffs' damages should have been limited accordingly. Any subsequent loss of pay simply was not caused by defendant's discrimination").

Courts outside of this Circuit have reached similar conclusions. See, e.g., U.S. Dep't of Labor v. Copart, Inc., 431 F. Appx. 758, 761 (10th Cir. 2011) (emphasis in original) ("it was proper for the court to consider the date [the defendant employer] ceased trucking operations [] when calculating back pay. . . . It would be nonsensical, as the district court noted, to place [the plaintiff] in a better position than all other drivers [the defendant] had employed"); Hill v. Spiegel, Inc., 708 F.2d 233, 238 (6th Cir. 1983) (concluding "loss of salary" damages should end on the date that defendant employer eliminated the entire division in which plaintiff had been employed); Grame v. Osborn Transp., Inc., 2001 WL 951357, at *2 (D. Kan. July 19, 2001) ("where an employer goes out of business and terminates all employees, plaintiff's eligibility for back pay ceases"); Bonura v. Chase Manhattan Bank, N.A., 629 F. Supp. 353, 356 (S.D.N.Y. 1986) (lost wages may be limited "to exclude the period after which the division in which the prevailing plaintiff worked was entirely eliminated"); Washington v. Kroger Co., 512 F. Supp. 67, 68 (W.D. Mo. 1981) ("plaintiff was not entitled to any back pay following the date [defendant] ceased operating").

However, courts have also held that where the business is sold and there is evidence that the new owners offered continued employment to existing employees, back pay is not necessarily limited to the date of the sale. For example, in Gaddy v. Abex Corp., 884 F.2d 312

29

(7th Cir. 1989), the United State Court of Appeals for the Seventh Circuit found that despite the sale of the plant at which plaintiff had worked, the plaintiff's back pay "need not be terminated as of the sale of the plant, since [the plaintiff] could have continued her employment" with the plant's new owner." Id. at 319. The court reasoned that "[a]lthough the sale of a plant often results in the restructuring and the effective elimination of former positions, here the evidence reveals that the remaining two employees in [plaintiff's] department continued their employment in the same positions with [the new owner] following the sale of the plant." Id.

Relying on the reasoning in Gaddy, the United States District Court for the Northern District of Ohio reached a similar conclusion in Thom v. American Standard, Inc., 2009 WL 961182 (N.D. Ohio Apr. 8, 2009), aff'd, 666 F.3d 968, 976 (6th Cir. 2012). In that case, the court held that the sale of the plant at which the plaintiff had worked to another company did not sever the plaintiff's back pay right because "employees similarly situated to Plaintiff were rehired after the [] asset sale. Thus, the asset sale does not sever Plaintiff's back pay." Id. at *4.

I find the foregoing analysis persuasive and consistent with the purpose of the back pay remedy, which is to restore the Plaintiff to the position they would have been in but for the discriminatory conduct. See Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 84 (3d Cir. 2009) ("Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination.") When a defendant employer ceases operations back pay is no longer necessary to achieve its equitable purpose. Limiting back pay to the period in which a defendant employer is in business ensures that a plaintiff has been restored to the position he would have been absent the discrimination – continued employment during the life of the business.

As there is no evidence in the record that finishers similarly situated to Plaintiff were offered employment at a different Exide distribution center, Plaintiff's potential back pay recovery will be limited to the period up until the Reading distribution center ceased operations on June 15, 2010.

IV.    **CONCLUSION**

For the foregoing reasons, Exide's motion for summary judgment is granted in part and denied in part. An appropriate Order follows.